UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 24-cr-10239-WGY |
| v. ) | |
| ) | |
| XIAOSONG WANG, ) | |
| ) | |
| Defendant ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

For approximately six years, defendant Xiaosong Wang participated in a sophisticated market manipulation scheme with co-conspirator Jiali Wang and others aimed at the U.S. securities markets. Perpetrated primarily from China, the scheme used age-old manipulation tactics to fraudulently exploit nuances in modern market structure to trick institutions providing market liquidity to trade at artificial prices. In so doing, Xiaosong Wang and his co-conspirators harmed the integrity and efficiency of U.S. markets while generating millions of dollars in illicit profits.

For the reasons discussed below, and based on the entire record in this case, the government submits that the sentence set forth in the parties' plea agreement pursuant to Rule 11(c)(1)(C)—namely, incarceration for 30 days, $1,041,084 in forfeiture, and an Order of Judicial Removal—is sufficient but not greater than necessary. Accordingly, the government respectfully requests that the Court issue the agreed-upon sentence.

### FACTUAL BACKGROUND

Xiaosong Wang is a citizen of the People's Republic of China, where he primarily resides. During the relevant time period he also visited the United States regularly and owned a residence in Upton, Massachusetts. The market manipulation scheme in which he participated involved at least eight co-conspirators, all but one of whom lived and worked exclusively in

China. (The exception was Jiali Wang, under whose leadership Xiaosong Wang participated in the scheme for over 4 years and who, like Xiaosong Wang, also visited the United States on a regular basis. *See United States v. Jiali Wang*, 22-cr-10123-WGY.) During the period of Xiaosong Wang's participation, the scheme generated over $4 million in illicit proceeds.

The scheme involved artificially affecting the prices of thinly traded securities on national securities exchanges in order to make money. To do so, the defendant and his co-conspirators exploited modern market structure, including specifically the role that private market makers and large brokerage firms play in providing market liquidity and price improvement for retail investors.

Today's securities markets are much more complex, fast, and automated than the bygone days when securities were traded on the floor of the New York Stock Exchange through human interactions. While securities can and do still trade in large part through the national stock exchanges, where offers to buy and sell securities are matched against each other in automated electronic transactions, a very significant portion of today's securities trades involve "non-exchange venues." These non-exchange venues include market makers who stand ready to buy and sell securities from their own inventory as well as large brokerage firms that sometimes execute their customers' orders from their own inventory. These non-exchange venues tend to operate at fast speeds using algorithms to direct their trading. To ensure that investors receive "best execution"—*i.e.*, the most favorable possible price under prevailing market conditions—regulations put in place by the U.S. Securities & Exchange Commission ("SEC") generally require that brokers ensure that their customers trade at prices equal to or better than the national best available offer to buy a particular security (if the customer is selling) or to sell the security (if the customer is buying) as reflected on the national exchange at the time of the trade (known

as the NBBO, or National Best Bid and Offer).  Given this requirement, when brokers route their customers' orders to non-exchange venues, the venues in turn generally execute the trades at prices at least equal to the NBBO.  In addition, to win brokers' business, the non-exchange venues often execute at prices better than the NBBO (a practice known as price improvement), which provides a benefit to the brokers' customers – *i.e.*, to retail investors—who receive a better price.  The non-exchange venues themselves nevertheless still profit based on arbitraging the remaining spread between the overall offers to buy and offers to sell securities in the market (the "bid-ask spread").

     The defendant and his co-conspirators took advantage of this market structure to line their pockets with profits generated from fraudulent market manipulation.  Specifically, using multiple brokerage accounts in different individuals' names simultaneously, the co-conspirators worked in small teams to strategically place small trades that would manipulate the price (*i.e.*, the NBBO) of thinly traded securities and then place much larger trades on the other side of the market intended to execute at non-exchange venues to capitalize on the artificial price movements they had generated.  The scheme involved using these tactics to both push securities prices artificially down as well as artificially up.  To push prices down, the co-conspirators would place small sell orders, often for 100 shares, at exchange venues at prices designed to give a false signal about a security's supply and to drive down the prevailing best offer to buy the security.  Once the price was depressed, the co-conspirators would then place a large buy order intended to execute at the depressed price at a non-exchange venue, thereby ensuring that the large buy order would not execute against the small sell orders simultaneously placed at exchange venues.  Once the large order was executed, the co-conspirators would then cancel their outstanding (manipulative) sell orders, thereby confirming that the sell orders were not bona

fide. The co-conspirators would then simply reverse this process later that same day in order to artificially inflate the security's price and then sell their shares at an artificially inflated price. The Information (Dkt. #82) and the Presentence Investigation Report ("PSR") (¶ 24) highlight three examples of these manipulations between January 2016 and September 2018.[1]

The scheme generated small profits on a per-trade basis, but enormous profits overall. As a general matter, the scheme intended to manipulate securities prices by at least several cents per instance and at times more than $0.25 per instance. As a result, the scheme generated illicit proceeds generally in the range of hundreds to thousands of dollars on a per instance basis. The defendant and his co-conspirators nevertheless ultimately generated millions in illicit proceeds by repeating this process thousands of times during the conspiracy.

A key to their fraudulent market manipulation was the co-conspirators' use of brokerage accounts in multiple different individuals' names simultaneously. Over the course of the conspiracy, the co-conspirators used at least 140 different brokerage accounts. The accounts were in the co-conspirators' names as well as in the names of family members and other nominees. For example, among the accounts used was an account in the name of one of the defendant's family members and an account in the name an individual in the United States with whom the Jiali Wang had a personal relationship. At times, the brokers that handled the co-conspirators' accounts would question their trading activity; to conceal their misconduct, the defendant and his co-conspirators crafted and sent false replies that purported to explain the trading with innocuous explanations, such as that the trading was the result of inadvertently hitting the wrong key on their computer. And when brokers shut down their accounts based on

---

[1] The securities that were the subject of these manipulations were CHS Inc.'s 8% Preferred Shares ("CHSCP"), SPAR Group Inc. ("SGRP"), and Craft Brew Alliance, Inc. ("BREW").

4

the suspicious trading, the co-conspirators simply opened new ones at different brokers or in different individuals' names.

For his part, during the period 2013 through mid-June 2017, the defendant participated in one particular trading team among several such teams involved in the scheme. Collectively, the teams were led by Jiali Wang, who hired the co-conspirators, led daily meetings of the co-conspirators, and, along with others, was responsible for distributing the scheme's illicit proceeds, including to the defendant's trading team. *See* PSR ¶ 26. During this period, the teams working for Jiali Wang generated approximately $3,076,063 in illicit proceeds. *See* PSR ¶ 28-32.

In or about mid-June 2017, the defendant broke off from Jiali Wang's larger group but continued to participate in the scheme with a smaller group of co-conspirators that did not include Jiali Wang. During this latter period, the defendant's smaller group generated approximately $1,041,084 additional illicit proceeds, for a total amount of illicit proceeds during the defendant's participation in the scheme of $4,117,148. *See* PSR ¶ 32.

## PROCEDURAL BACKGROUND

Both the defendant and Jiali Wang were arrested on a criminal complaint (naming both as defendants) on October 14, 2019, while each was in the United States. *See* Dkt. #1. Xiaosong Wang was initially detained pending trial but released eight days later on October 22, 2019 pursuant to a secured bond and a curfew. *See* Dkts. #14-15.

On May 12, 2022, counsel for Jiali Wang filed a motion to dismiss the criminal complaint for violation of the Speedy Trial Act. *See* Dkt. #77 in Case No. 22cr10123-WGY. Shortly thereafter, on May 24, 2022, a grand jury returned an indictment, charging Jiali Wang with conspiracy to commit securities fraud and conspiracy to commit market manipulation. *See*

Dkt. #79 in Case No. 22cr10123-WGY.  The following month, Jiali Wang moved to dismiss the indictment for violation of the Speedy Trial Act and his Sixth Amendment right to a speedy trial.[2]  The government opposed the motion.  At a hearing on the motion on July 28, 2022, the Court dismissed the indictment against Jiali Wang without prejudice.  *See* Dkt. #103 in Case No. 22cr10123-WGY.  Soon thereafter, Jiali Wang and the government reached a plea agreement pursuant to Rule 11(c)(1)(C) and, in August 2022, Jiali Wang pleaded guilty to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349.  *See* Dkts. #104, 109 in Case No. 22cr10123-WGY.  Probation, the government, and Jiali Wang calculated a total offense level of 28 for Jiali Wang, with an associated guideline sentencing range of 78 to 97 months.  In November 2022, the Court accepted the plea agreement and sentenced Jiali Wang to time served (approximately 3.5 months incarceration); supervised release for nine months, with a condition of home detention for 22 hours per day; and forfeiture in the amount of $7.75 million.  *See* Dkt. #125 in Case No. 22cr10123-WGY.

Jiali Wang's term of supervised release terminated approximately one month early when he was unexpectedly arrested by U.S. Immigration and Customs Enforcement ("ICE") agents in early April 2023 while still serving supervised release on home detention in the United States.  Jiali Wang was subsequently deported pursuant to an Order of Judicial Removal issued by the Court upon a government motion.  *See* Dkts. # 147, 149, 151 in Case No. 22cr10123-WGY.

Following the Court's acceptance of the government's Rule 11(c)(1)(C) plea agreement with Jiali Wang, the government and Xiaosong Wang negotiated and entered into the operative

---

[2] The motion was filed under seal, as was the government's brief in opposition.

6

plea agreement in this matter, also pursuant to Rule 11(c)(1)(C).[3]  *See* Dkt. #85.  Xiaosong Wang subsequently pleaded guilty in September 2024 to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349.[4]  *See* Dkt. #90.

## GUIDELINES SENTENCING RANGE

The government agrees with guidelines sentencing range calculated by Probation, which is consistent with the guidelines sentencing range calculated by the parties in the plea agreement. *See* Dkt. #85.  Specifically, as calculated by Probation, Xiaosong Wang's total offense level is 22, which, given Xiaosong Wang's lack of a criminal history, results in a sentencing guidelines range of 41 to 51 months.  *See* PSR ¶¶ 38-48, 78.

## AGREED-UPON DISPOSITION & FORFEITURE AMOUNT

The parties' plea agreement was reached pursuant to Rule 11(c)(1)(C) and provides an agreed-upon disposition, subject to the Court's acceptance of the plea agreement.  *See* Dkt. #85. That disposition entails: (i) incarceration for 30 days (of which the defendant has already served eight days), (ii) $1,041,084 in forfeiture, (iii) an Order of Judicial Removal, and (iv) a $100 special assessment.  The parties' plea agreement also includes an appeal waiver.

---

[3] The same circumstances that Jiali Wang cited to seek relief pursuant to the Speedy Trial Act existed for Xiaosong Wang.  Unlike Jiali Wang, however, Xiaosong Wang did not move to dismiss the complaint.

[4] The day after Xiaosong Wang's 2019 arrest, the SEC also filed a parallel civil enforcement action against Xiaosong Wang, Jiali Wang, and over 20 others, including relief defendants.  *See SEC v. Chen*, 19-cv-12127-WGY (Dkt. #1) (Complaint).  In September 2021, the Court entered a consent judgment against Xiaosong Wang, imposing certain injunctive relief while leaving the issue of financial remedies open pending the outcome of this criminal matter.  *See id.*, Dkt. #162.  In March 2023, the Court entered a final judgment against Jiali Wang ordering him to disgorge the same $7.75 million that the Court ordered in forfeiture in the criminal matter against him.  *See id.*, Dkt. #214.  And in June 2022, the Court entered a default judgment against the remaining defendants and ordered over $35 million in disgorgement on a joint-and-several basis.  *See id.*, Dkts. #200, 201.

In advance of sentencing, in November 2024, the Court entered an assented-to Order of Forfeiture (Money Judgment) consistent with the parties' plea agreement. *See* Dkt. #99. The order imposed forfeiture in the amount of $1,041,084, equal to the illicit proceeds generated by Xiaosong Wang's trading group after Xiaosong Wang broke off from Jiali Wang's group of traders. (Because the Court ordered Jiali Wang to forfeit $7.75 million in forfeiture based on the illicit proceeds generated by Jiali Wang's group of traders—which amount Jiali Wang has already paid—the government is not seeking forfeiture from Xiaosong Wang for the period that Xiaosong Wang was a member of Jiali Wang's group of traders.)

Also in advance of sentencing, in September 2024, the Court entered the parties' agreed-upon Order of Judicial Removal. *See* Dkt. #95. If the Court accepts the plea agreement and imposes the agreed-upon 30 days of incarceration, the parties anticipate that ICE will work to process the defendant's removal while he serves his remaining 22 days. To this end, the government requests that the Court recommend that the defendant serve the remainder of his sentence at the Wyatt Detention Facility.[5]

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The below assessment of the § 3553(a) factors demonstrates that the parties agreed-upon sentence is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A. Nature and Circumstances of the Offense

As the Court noted at the hearing on Jiali Wang's motion to dismiss, Xiaosong Wang's crime is not a violent crime, and therefore is not among the most serious of crimes. Nevertheless, all forms of illegal market manipulation are serious, this one included, which went

---

[5] The undersigned has worked extensively with ICE and defense counsel to facilitate ICE's anticipated prompt processing of the defendant's removal from the Wyatt Detention Facility during the period of his proposed sentence.

on for approximately six years and was perpetrated from abroad. Market manipulation schemes harm the integrity and efficiency of the U.S. securities markets to the detriment of all investors. When investors believe the markets are rigged, or lose confidence in the integrity of the markets, the markets become less liquid, less attractive, and more volatile. And the nature of this particular scheme—which generated profits by causing non-exchange venues to trade at artificial prices slightly below or above the true NBBO—likely caused real (even if diffuse) harm to retail investors. This is because the non-exchange venues, when trading with the defendant and his co-conspirators, very likely either lost money or made less money. As a result, the non-exchange venues likely decreased the amount of price improvement they were willing to offer retail investors to win brokers' business, to retail investors' detriment. The proposed sentence recognizes that the defendant's crime was serious, although not among the most serious in the criminal law.

### B. History and Characteristics of the Defendant

In his favor, the defendant stands before the Court with no criminal history. It is also the case that, when he committed the offense of conviction, he was not within a U.S.-based financial institution with rigorous compliance and training functions. And finally, he has spent an extended length of time in the United States while this case has been pending, away from his home in China.

### C. Deterrence and Promoting Respect for the Law

As the defendant's crime reflects, market manipulation schemes involving brokerage accounts in multiple individuals' names can be difficult to identify and relatively easy to reproduce when caught by particularly on-the-ball brokers. Accordingly, general deterrence and the need to promote respect for the law are important considerations when fashioning a just

sentence for these types of crimes. Here, however, consideration should also be given to the fact that the defendant's scheme was not perpetrated by sophisticated securities professionals who trained in the United States and passed rigorous securities examinations. While the defendant knew that this form of market manipulation was illegal, his conduct did not involve flouting compliance protocols at his own firm (as others have done). In addition, the government acknowledges that similar market manipulation conduct has been charged only by the SEC and not criminally in some cases in the past. And those cases that have resolved criminally have often included sentences significantly below the guidelines sentencing rage. These facts and circumstances, along with those discussed previously above, mitigate the need for a sentence of any greater length than the sentence proposed by the parties.

**D. Need to Avoid Unwarranted Sentence Disparities**

Finally, the need to avoid unwarranted sentence disparities is a key factor in considering the appropriate sentence in this matter. The Court previously sentenced Jiali Wang to term of incarceration for approximately 3.5 months, followed by supervised release on home detention for 9 months. Jiali Wang was the scheme's leader and had a significantly higher guidelines sentencing range: 78 to 97 months (Jiali) to 41 to 51 months (Xiaosong).[6] As a less culpable member of the scheme, it is appropriate for Xiaosong Wang to receive a more lenient sentence. In addition, given that ICE arrested Jiali Wang during Jiali Wang's period of home detention on supervised release, the government is not requesting (and the plea agreement's agreed-upon

---

[6] Note, Jiali Wang's sentencing took place before USSG Section 4C1.1 went into effect, which provides for a two-level reduction for certain zero-point offenders and which has been incorporated into Xiaosong Wang's guidelines sentencing range. Jiali Wang would have qualified for the reduction had Section 4C1.1 been in effect at the time of Jiali Wang's sentencing. After applying a two-level reduction, Jiali Wang's guidelines sentencing range would have been 63 to 78 months.

disposition does not include) a period of supervised release on home detention for Xiaosong Wang. The government is unable to ensure that such a period of home detention could be fulfilled given Xiaosong Wang's immigration status.

## CONCLUSION

For the reasons discussed herein, the United States requests that the Court sentence defendant Xiaosong Wang to the agreed-upon sentence in the parties' plea agreement: namely, incarceration for 30 days, $1,041,084 in forfeiture (already separately ordered), and an Order of Judicial Removal (already separately ordered). The government further requests that the Court recommend that the defendant serve the remainder of his sentence at the Wyatt Detention Facility. The government does not object to self-surrender.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By: */s/ James R. Drabick*
James R. Drabick
Assistant United States Attorney
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
Tel: (617) 748-3100
Date: December 9, 2024    james.drabick@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be sent to those indicated as non-registered participants.

                                            */s/ James R. Drabick*
                                            James R. Drabick
                                            Assistant United States Attorney

Date:  December 9, 2024