UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | 1:24-cr-10239-WGY |
| XIAOSONG WANG ) | |

Sentencing Memorandum

Xiaosong Wang stands before the Court convicted of Conspiracy to Commit Securities Fraud in violation of 18 U.S.C. §1349 and 1348. He feels a profound sense of shame for his role in committing this criminal offense and accepts full responsibility. Based on the parties' view of Mr. Wang's background, lack of any prior criminal history, the nature of Mr. Wang's role in the offense, and to avoid any unwarranted disparity, the parties jointly propose the sentence outlined in the plea agreement: thirty days incarceration, followed by removal to the People's Republic of China, and forfeiture as outlined in the plea agreement. PSR ¶4. This proposed resolution is in line with this Court's sentence in the related case of *Jiali Wang*, 1:22-cr-10123-WGY. Dkt. 124, 148.

For the reasons described in this memorandum as well as in the government's filing, the parties urge this Court to adopt the proposed resolution. Based on the full totality of circumstances involving this case, the proposed sentence is sufficient, serious, and just. 18 U.S.C. § 3553(a). The parties believe the proposed sentence fits squarely within the goals of 3553(a) and is a sentence "sufficient, but not greater than necessary."

    I.    **Mr. Wang's Background & Nature of the Offense**

    a.  *Background*

Mr. Wang was born in the Qingdao province of the People's Republic of China in 1987. It was the beginning of enforcing the one-child policy across China. The country was coming out of the Cultural Revolution of the 1970's and 1980's, and the economic conditions were difficult. His parents had experienced the turmoil of the Cultural Revolution. All of these factors affected Mr. Wang's view of the world as a child and young adult. Mr. Wang had no siblings, but many cousins. The cousins on his mother's side were all girls and he was the only boy. Mr. Wang looked up to his uncle, who had applied to graduate school in the United States. His uncle was the first to leave their family and travel abroad to America. At that time it was considered a great honor and rare to be chosen for an educational opportunity in the United States. Mr. Wang closely followed his uncle's path and was inspired by his hard work and success. His uncle worked in a restaurant in the United States while he studied for his Ph.D. Every year, he returned to China to visit his family, bringing back candy and toys that Mr. Wang had never seen before.

A young Mr. Wang watched as his uncle worked with slow determination and to bring his family into the middle class in the United States and achieved success: the American dream. Mr. Wang was fascinated and affected by his uncle's strong resolve and mindset, and this pushed him to work hard in school and pursue an engineering degree. In 2012, Mr. Wang graduated from the Qingdao University of Science and Technology with a degree in civil engineering. Following graduation, he worked consistently in the fields of software and engineering, but he dreamed of bigger things and the ability to travel abroad. It was against this backdrop that his connection to Jiali Wang began, and his subsequent involvement in this crime.

b.  *Nature of Offense*

The facts of the offense are included in detail in the Presentence Report at ¶¶10-33. Mr. Wang was ultimately involved in the conspiracy from around 2013-2018. After college, Mr. Wang wanted to travel farther from home and see more of the world. He had studied close to home for college primarily because his mother wanted him to stay in their province. Following graduation, he moved to Beijing and started working at a company there, but was not finding the satisfaction he sought in this work. An uncle in Beijing noticed that he was floating from job to job without much satisfaction. He heard about Jiali Wang and the work he did from another family member, and thought this would be a good option for his nephew.

Mr. Wang had no background or training in the financial industry. Jiali Wang was involved with trading in American stock. For many years, people told Mr. Wang that trading in American stocks was very favorable, and he wanted to learn more about it. Jiali Wang taught him everything there was to learn about trading, and the methods of deception involved in this case. Mr. Wang wanted to learn this profession and immerse himself into the challenge of something different – trading in the stock market. On the negative side, he lacked the experience, and he did not do his own due diligence to investigate the methods they were using. In fact, what they were doing was participating in a market manipulation scheme, placing small orders intended to artificially affect securities' prices, and then they would make money on the artificial new prices. When the brokerage accounts faced scrutiny, Mr. Wang and other conspirators made explanations to cover what they were doing, or opened new accounts. Mr. Jiali Wang was in charge and the leader of the scheme, and taught Mr. Wang how to participate. Mr. Jiali

3

Wang organized the conspirators, led the meetings, and distributed the proceeds during the entire period from 2013-2017. PSR ¶26.

Mr. Wang's role was to trade in the night and into the morning, when most people were resting in China. Mr. Wang's understanding *in the beginning* was that many people were trading in this way – and did not learn it was illegal until later. By then, he felt Mr. desensitized to what he was doing, and because it was very lucrative, he continued. In 2017 they (Jiali and Mr. Wang) separated ways. After 2017 Mr. Wang established with family members his own trading team - with his family and friends, modeling it after Jiali Wang's methods. PSR ¶26. A small portion of it was legitimate trading. After they became a team of four, they increased the scale of the trading until sometime before he was arrested. Mr. Wang was detained from October 14, 2019 until October 22, 2019, before he was released on pretrial supervision. He has had no issues of noncompliance while on pretrial supervision.

## II.     Guidelines, 3553(a), and Just Punishment

The guideline range is properly calculated in the Presentence Report at ¶¶39-48. The total offense level is 22, and Mr. Wang is a "zero point offender" an in criminal history category I. PSR ¶45, 48. However, the analysis does not end with a proper calculation of the guidelines. While courts must continue to *consider* the sentencing guidelines, the Supreme Court has held that the Court may not presume that the guideline sentencing range is reasonable, and Congress has *required* federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 128 S.Ct. 558 (2007); *Gall v. United States*, 128 S.Ct. 586 (2007); *Rita v. United States,* 551 U.S. 338 (2007).

### A. Fraud Guidelines U.S.S.G. § 2B1.1

As in any case involving money, the amount of economic loss drives the guidelines. In this case the loss amount provides for an 18-Level increase to the offense level based on the table at USSG §2B1.1(b)(J). Here, in a case involving a scheme to deflate and then inflate the price of securities, the Guidelines application notes suggest that the Court may use "any method that is appropriate and practicable" to determine the loss. Application Note 3(E)(ix) of §2B1.1(b)(1). PSR ¶39. Courts have often recognized that the financial guideline is crude and frequently ill-fitting. See *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y 2006) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense), See "At a Loss for Justice: Federal Sentencing for Economic Offenses" A. Ellis, M. Allenbaugh, *Criminal Justice*, Volume 25, Number 4, Winter 2011.

A sentencing process driven largely if not exclusively on a finding of loss ignores many important elements of Section 3553(a), as Judge Rakoff poignantly observed in *United States v. Gupta*, 904 F.Supp.2d 349,350 (S.D.N.Y. 2012):

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

As Judge Rakoff observed in an earlier decision, "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear

5

'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson,* 441 F.Supp.2d 506,510 (S.D.N.Y. 2006), *aff'd 301* Fed.Appx. 93 (2d Cir. 2008), *citing generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).

Layered on top of this "sentencing by numbers" issue, several jurists, including Judge Rakoff, have criticized the Guidelines loss table in particular, in part because the evolving astronomical increases in the loss table derive from congressional (political) mandate and they lack empirical support. As Judge Rakoff observed in *Gupta,* "[f]rom almost the outset," the Guidelines "deviated" from its goal of curing sentencing disparity by tethering sentencing "to what empirical data showed was the average sentence previously imposed by federal judges for that crime" *Gupta,* 904 F. Supp. 2d at 350. The deviation is found not only in the disparity between crack and powder cocaine, *see id.* (noting that "the Sentencing Commission had no more empirical basis for imposing the ratio of 18-to-1 than for earlier imposing the ratio of 100-to-l. In both cases, the numbers were plucked from thin air"), but also in the area of fraud and loss, as Judge Rakoff addressed in *Gupta:*

> While this example is drawn from the area of narcotics, the fundamental point is equally applicable to the instant case. Here, as there, the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology-thus maximizing the risk of injustice. Another example of the deviation of the Guidelines from the original goals of the Sentencing Commission…**is the huge increase in the recommended Guidelines sentences for securities fraud cases. The Guidelines' calculations for this offense are no longer tied to the mean of what Federal judges had previously imposed for such crimes, but**

6

**instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.** *Id.* at 351 (emphasis added).

In *Gupta,* the Court discussed "the hypothetical but typical case described by Professor Kate Stith of Yale Law School, involving a typical securities fraud defendant who pled guilty to inflating the financial figures of a public company, thereby causing at least 250 shareholders to collectively suffer a reduction of more than $12.5 million in the value of their shares." *Id* "In 1987, such a defendant would have faced a Guidelines sentence of 30-37 months; but by 2003, the same defendant would have faced a Guidelines sentence of 151-188 months, a more than 500% increase." *Id.* citing Kate Stith, *Federal Sentencing: The One-Way Ratchet,* New York City Bar Association First Annual Conference on White Collar Crime (May 2012). After noting that the "vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom," the Court observed that "in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense." *Gupta,* 904 F. Supp. 2d at 351. "By making a Guidelines sentence turn, for all practical purposes, on this single factor, [however,] the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Gupta,* 904 F. Supp. 2d at 351.

Judge Rakoff is not the only judge to emphasize the irrationality in sentencing a human being based principally, if not exclusively, on the Guidelines loss table. In a

concurring opinion in *United States v. Corsey,* 723 F.3d 366, 379-80 (2nd Cir. 2013), Judge Underhill (United States District Court for the District of Connecticut, sitting by designation) made the following observation:

> The Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing. In 1989, in response to the savings and loan crisis, Congress passed legislation increasing the maximum penalties for financial fraud offenses and directing the Sentencing Commission to include specific offense characteristic enhancements in the fraud guideline. .. In 2001, the Sentencing Commission amended the Guidelines to combine the fraud, theft and embezzlement, and property destruction guidelines into a single guideline, section 2B 1.1. That change was accompanied by the publication of a new loss table that had the effect of increasing offense level calculations, especially for high-dollar value crimes… Most recently, the fraud guideline was amended in 2003 in response to Congressional directives in the Sarbanes-Oxley Act. Those amendments included further changes to the loss table that added offense level points in the highest loss cases. U.S.S.G. app. C amend. 647 (Nov. 1, 2003). The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.

*Corsey,* at 379-80 (internal citations omitted). *See also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.").

The Sentencing Guidelines also provides guidance for securities fraud cases with similar "spoofing" conduct, where the market is flooded with orders to buy or sell that are cancelled before they go through. USSG §2B1.1 application note 21(C) provides:

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted. For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that

substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.

The loss table as the driving force behind an advisory guideline range can be a poor proxy for particularities of this kind of case, and warrant a downward departure. Certainly, Mr. Wang's role in this offense was not that of a sophisticated securities professional with training and education in this field. His case is also outside of the realm of typically charged securities fraud cases where defendants do possess that background and training and who disregard the compliance rules at their firms.

Here, the Court can also look to the reasoning behind the imposition of sentence in *Jiali Wang*, 1:22-cr-10123-WGY. Dkt. 124, 148. It is undisputed that Mr. Jiali Wang was the leader of the conspiracy with this defendant. There, the Court accepted the parties' plea agreement recommendation and imposed a sentence of "time served" (3 months imprisonment) followed by 9 months of supervised release, and forfeiture. Mr. Jiali Wang's advisory guideline range was 78-97 months, with a total offense level of 28. Mr. Jiali Wang was taken into Immigration custody following one month of supervised release, and upon motion of the defendant, this Court granted a request for an Order of Judicial Removal. Dkt. 148.

### B. Disparity, Kinds of Sentences, Seriousness

A sentence significantly below the advisory sentencing guideline range is appropriate to avoid unwarranted sentencing disparity, especially in a case like Mr. Wang's where his conduct is relatively unsophisticated and where he was acting under Mr. Jiali Wang's leadership. Mr. Xiaosong Wang did not speak English, did not receive any training by any United States brokerage firms or highly regulated financial institutions, and acted mainly at the direction of Mr. Jiali Wang. Mr. Jiali Wang received

a sentence of "time served" - 3 months. See, *United States v. Jiali Wang*, 1:22-cr-10123-WGY. Dkt. 124, 148. Mr. Jiali Wang acted as a recruiter and supervisor to Mr. Xiaosong Wangs role in this offense, and the parties' requested sentence takes the difference in roles into effect.

### III.    Conclusion

Mr. Wang, a man who had such promise in coming to this country, is deeply remorseful for his criminal conduct. The parties spent considerable attention to the plea agreement in this case and assert that it satisfies each of the sentencing criteria in this case. The parties ask the Court to sentence Mr. Wang to a term of 30 days incarceration, with no term of supervised release to follow, and the entry of an Order of Judicial Removal to the People's Republic of China upon completion of his term of incarceration.

Respectfully Submitted,

XIAOSONG WANG

By his attorney,

/s/ Cara McNamara
Cara McNamara
B.B.O. 712096.
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

### CERTIFICATE OF SERVICE

I, Cara McNamara, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 12, 2024.

/s/ Cara McNamara
Cara McNamara